Michael Delikat
James H. McQuade
Mayotta H. Anderson
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 506-5000

Attorneys for Defendant Wyeth Pharmaceuticals, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NADINE ASPILAIRE,<br><br>                    Plaintiff,<br><br>          -against-<br><br>WYETH PHARMACEUTICALS, INC.,<br><br>                    Defendant. | 07-CV-952 (WCC)(MDF)<br><br>**DEFENDANT'S RULE 56.1 STATEMENT** |

Defendant Wyeth Pharmaceuticals, Inc. ("Wyeth"), by its attorneys, Orrick, Herrington & Sutcliffe LLP, as and for its statement of material facts as to which there is no genuine issue to be tried, states as follows:

**Background**

1.      Wyeth is a company engaged in the development and manufacture of pharmaceutical, consumer healthcare, and animal health products.   Wyeth operates a pharmaceutical manufacturing facility in Pearl River, New York.  Declaration of James Rowan ("Rowan Decl."), ¶ 2.

2.      Wyeth generally operates three different working shifts at the Pearl River facility: (a) the first shift, which generally runs from 7:00 a.m. to 3:30 p.m.; (b) the second shift, which

generally runs from 3:00 p.m. to 11:30 p.m.; and (c) the third shift, which generally runs from 11:00 p.m. to 7:30 a.m.  Declaration of James H. McQuade ("McQuade Decl."), Ex. 1, at 37-38.

3.      Employees at Wyeth who hold biological operator and lead biological operator positions work directly on manufacturing lines at the Pearl River facility. Rowan Decl., ¶ 3.

4.      Operators and lead operators are union employees whose employment is governed by the terms of the contract between Wyeth and the International Chemical Workers Union, Local 143c (the "Union Contract").  Rowan Decl., ¶ 4 & Ex. 1; McQuade Decl. Ex. 1, at 44-45 & Ex. 5.

5.      Plaintiff Nadine Aspilaire was a union employee during her employment with Wyeth and understood that the Union Contract governed the terms of her employment at Wyeth. McQuade Decl. Ex. 1, at 44-45 & Ex. 5.

6.      Aspilaire began her employment with Wyeth in January 2000 as a packaging operator on the second shift, working from 3:00 p.m. to 11:30 p.m. in Department 735. McQuade Decl. Ex. 1, at 30-32, 39, 42 & Ex. 4.

7.      Aspilaire does not claim that she was discriminated against based on her race while she worked as a packaging operator from January 2000 through December 2000. McQuade Decl. Ex. 1, at 82-83.

**Aspilaire's Claim Based on Her Rate of Pay**
**From December 2000 through November 2002**

8.      The Union Contract provides three categories of pay rates in each labor grade for each union job classification for each calendar year covered by the Union Contract.  Aspilaire Decl. Ex. 1, at 48-50 & Ex. 5, at Schedules A-F; Rowan Decl., ¶ 6 & Ex. 2.

9.     The different categories of pay rates under the Union Contract include a starting pay rate, a 6-8 week pay rate, and a maximum pay rate. McQuade Decl. Ex. 1, at 48-50; Rowan Decl., ¶ 6 & Ex. 2.

10.    In order for an operator or lead operator to receive the maximum pay rate, the operator or lead operator must complete all required skill blocks for a particular position. Rowan Decl., ¶ 6 & Ex. 2.

11.    An employee completes a skill block by completing all of the training required for a particular position and by performing the relevant job tasks for a particular position in the presence of a Wyeth trainer who must verify that the employee is able to properly perform the job tasks. McQuade Decl., Ex. 1, at 87-89; Rowan Decl., ¶ 7.

12.    The pay rate schedules in the Union Contract apply across the board to all union employees. McQuade Decl., Ex. 1, at 77.

13.    On October 17, 2000, Aspilaire applied for a position as a lead biological operator in Department 421 working on the second shift. McQuade Decl., Ex. 1, at 82-85 & Exs. 7-8.

14.    In December 2000, David Coen hired Aspilaire for this position as a lead biological operator in Department 421 on the second shift. McQuade Decl., Ex. 1, at 89. This position constituted a promotion for Aspilaire. Rowan Decl., ¶ 8.

15.    In connection with her promotion to this position, Aspilaire's labor grade was increased from 7 to 9, and she received an increase in her pay rate to $16.19 per hour, which was the 6-8 week pay rate under the Union Contract. McQuade Decl. Ex. 1, at Ex. 6; Rowan Decl., ¶ 8.

16.    At the time she was hired for the lead biological operator position, Aspilaire had not taken any courses or received any training for the position. McQuade Decl., Ex. 1, at 85-87.

17.    Shortly after being hired into this position on December 11, 2000, Aspilaire went on a leave of absence on January 16, 2001 and remained on this leave of absence through May 26, 2001. McQuade Decl. Ex. 1, at 102-03.

18.    On January 16, 2002, Aspilaire's labor grade was increased from 9 to 10, and she received an increase in her pay rate to $17.64 per hour or an annual salary of $36,691, which was the 6-8 week pay rate under the Union Contract. McQuade Decl. Ex. 1, at 106-07 & Ex. 6; Rowan Decl., ¶ 9.

19.    In November 2002, Aspilaire completed the four skill block requirements for the biological operator position, and she received an increase in her pay rate to $18.05 per hour, or an annual salary of $37,544, which was the maximum pay rate under the Union Contract. McQuade Decl. Ex. 1, at 93-94, 98, 112-14 & Exs. 5-6; Rowan Decl., ¶ 10 & Ex. 3.

20.    Aspilaire did not receive the maximum pay rate prior to November 2002, because she had not completed all of the necessary skill blocks before that date. Rowan Decl., ¶ 11.

21.    Aspilaire continued to receive the maximum pay rate under the Union Contract until she resigned from Wyeth in 2005. McQuade Decl. Ex. 1, at Exs. 5 & 6; Rowan Decl., ¶ 11.

22.    Aspilaire's claim that she did not receive the maximum pay rate is confined to the time period from December 2000 through November 2002. McQuade Decl. Ex. 1, at 271.

23.    According to Aspilaire, she complained to Jeff Gathers, the Union Vice President, that, as of January 2001, she was not receiving the maximum pay rate under the Union Contract, and Gathers told Aspilaire that she was not receiving the maximum pay rate because she had not completed all of the required skill blocks. McQuade Decl. Ex. 1, at 51-55, 92-93.

24.    Aspilaire claims that James Mihalis and Lissy Saju, lead biological operators in Department 421 during Aspilaire's employment with Wyeth, received the maximum pay rate under the Union Contract without completing the requisite skill blocks. Rowan Decl., ¶ 12.

25.    Mihalis, a lead biological operator in Department 421, received the maximum pay rate under the Union Contract only after he had completed the requisite skill blocks to do so. Rowan Decl., ¶ 12 & Exs. 4-5.

26.    Lissy Saju achieved the maximum pay rate under the Union Contract while working as a floor leader in Department 736 in the pharmaceutical packaging organization at Wyeth. Rowan Decl., ¶ 12 & Ex. 6. Saju continued to receive the maximum pay rate under the Union Contract when she was laterally transferred in May 2001 from her position as floor leader to the position of lead biological operator in Department 421. *Id.* Wyeth has been unable to locate any records relating to the skill blocks Saju completed after her transfer to Department 421. Rowan Decl., ¶ 12. In the event that Saju did not complete all of the skill blocks for the lead biological operator position, an oversight or error may have been made by Wyeth when it allowed Saju to continue to receive her maximum pay rate after she was transferred to the lead biological operator position. *Id.*

**Aspilaire's Shift Claims**

27.    In October 2001, Aspilaire applied for a position as a lead biological operator on the third shift. McQuade Decl. Ex. 1, at 103-05 & Exs. 6 & 9-10. David Coen hired Aspilaire for this position, and Aspilaire began working on the third shift. McQuade Decl. Ex. 1, at 121-22 & Exs. 9 & 10.

28.    In March 2002, Aspilaire applied for a position as a lead biological operator in Department 421 on the first shift. McQuade Decl. Ex. 1, at 106-07 & Exs. 6, 11-12. In or about

April 2002, David Coen hired Aspilaire for this position on the first shift. McQuade Decl. Ex. 1, at 107-08, 122-23 & Exs. 6, 11-12.

29.    Aspilaire claims that, after she was moved to the first shift, during the time period April 2002 through June 2002, she was forced to work on the first shift and the second shift on Mondays, Tuesdays, Thursdays, and Fridays, so that she was working 16 hours a day on those days. McQuade Decl. Ex. 1, at 132-33, 136-38.

30.    Wyeth operators and lead operators frequently have to work double shifts during certain time periods when, for example, production demands increase or there is a shortage of trained operators. Declaration of David Coen ("Coen Decl."), ¶ 5. On those occasions Aspilaire would have been required to work double shifts if there had been a need for such work. *Id.*

31.    Aspilaire admits that employees of all races were required to work 16-hour days in Department 421 and that she was not the only one that was required to work 16-hour days on occasion. McQuade Decl. Ex. 1, at 278-79.

32.    Aspilaire admits that she was required to work 16-hour days because Wyeth was short on lead operators. McQuade Decl. Ex. 1, at 140.

33.    According to Aspilaire, shortly after taking the position as a lead biological operator on the first shift, she was forced to work on the second shift. McQuade Decl. Ex. 1, at 117-18. At her deposition, Aspilaire estimated that this occurred within two months of April 15, 2002, in June 2002. McQuade Decl. Ex. 1, at 123-24, 136-37.

34.    Operators and lead operators, like Aspilaire, may be forced to work on shifts they are not regularly scheduled to work based on seniority and need. Coen Decl., ¶ 6. To the extent Aspilaire had been forced to work on the second shift as she claims, it would have been because

there was a need for additional operators and/or lead operators on the second shift at that given time. *Id.*

## Aspilaire's Scheduling Claim

35.    Delores Perry was responsible for preparing the work schedules for employees in Department 421. McQuade Decl. Ex. 2, at 17-18; Coen Decl., ¶ 7. Perry scheduled employees to work in certain manufacturing areas based on the business needs of the manufacturing areas and based on an employee's qualifications to work in a given area. Coen Decl., ¶ 7.

36.    Perry frequently scheduled lead operators to work as operators when the need arose, such as when there was a shortage of operators in a particular area or when there were more lead operators than were needed at particular time. Coen Decl., ¶ 8.

37.    On those occasions that Aspilaire was scheduled to work as an operator in the inspection area, it was because there was a need for her to work in the inspection area. Coen Decl. ¶ 8.

38.    As a lead operator, Aspilaire was responsible for performing the same duties as an operator, but, in addition to those duties, was responsible for reviewing some of the paperwork prepared by the operators and assisting supervisors. McQuade Decl. Ex. 1, at 141.

39.    The job description of the lead biological operator specifically states that the lead biological operator performs "all duties" of a biological operator. McQuade Decl. Ex. 1, & Ex. 9.

40.    Aspilaire admits that it was "common" for lead operators to work as operators, particularly when there was a shortage of operators. McQuade Decl. Ex. 1, at 145-46.

41.     Aspilaire admits that she and other lead biological operators were scheduled to work as operators in the inspection area and that responsibility was part of their job. McQuade Decl. Ex. 1, at 161.

42.     Aspilaire claims that she was frequently scheduled to work as an operator in the inspection area and that the number of times she was scheduled to work as an operator in the inspection area is reflected in the schedules she produced in discovery in this action. McQuade Decl. Ex. 1, at 112-13, 145-48; McQuade Decl., ¶ 5 & Ex. 4.

43.     The schedules Aspilaire produced in this litigation cover the time period July 26, 2004 through February 17, 2005. McQuade Decl. Ex. 4. The schedules indicate that a number of lead operators who were white were required to work in the inspection area as operators during that time period, including Merrill McIntyre, Damian Corvasce and Marie Novellino. Coen Decl., ¶ 10.

44.     The schedules Aspilaire produced during that time period further indicate that many of the individual who were scheduled to work as lead biological operator in that time period were African Americans, including Yvonne DeCosta, Columbus Tyson and Geneva Berry. Coen Decl., ¶ 10.

45.     Aspilaire claims that she was moved to work in the syringe area in early 2004, and that after she began working and getting her training there, she was told the syringe area was too slow and was not fully operational, and, as a result, she was sent back to work in the inspection area. McQuade Decl. Ex. 1, at 143-44, 229, 232-33.

46.     Aspilaire admits that at some point in time, she was permitted to work in the syringe area as a lead operator. McQuade Decl. Ex. 1, at 150-51.

## Aspilaire's Application for the Document Specialist Position

47.    In or about September 2004, Brian Uram began to seek applicants for three identical administrative assistant positions – also referred to as document specialist positions – one on each of the three shifts – all reporting to him.  McQuade Decl. Ex. 1, at 193, 206-07; McQuade Decl. Ex. 3, at 18, 23-25; Declaration of Brian Uram ("Uram Decl."), ¶ 2.

48.    The administrative assistants hired for these positions would be responsible for the full support of the vial filling operations, including reviewing and ensuring the timely completion of batch records and other documents that were required by current Good Manufacturing Practices and for delivering these documents to Wyeth's Quality Assurance area for review.  McQuade Decl. Ex. at 192-94 & Ex. 17; McQuade Decl. Ex. 3, at 29; Uram Decl., ¶ 3.

49.    More than 20 people applied for these three positions, and Uram interviewed approximately 20 people for these positions.  McQuade Decl. Ex. 3, at 25-26; Uram Decl., ¶ 4.

50.    The majority of the applicants applied for the first shift, as that shift generally was more popular than the second or third shift.  Uram Decl., ¶ 4.

51.    In September 2004, Aspilaire submitted a bid for the administrative assistant position on the first shift.  McQuade Decl. Ex. 1, at 192, 208-09 & Exs. 17-18; Uram Decl., ¶ 5.

52.    Aspilaire does not recall if she applied for the administrative assistant position on the second shift.  McQuade Decl. Ex. 1, at 193, 209.  At the time she applied for this position, Aspilaire was attending school one night each week in the evening, during the time she would have had to work on the second shift.  McQuade Decl. Ex. 1, at 212.

53.    Aspilaire did not apply for the third shift position.  McQuade Decl. Ex. 1, at 207-08.

54.    Uram interviewed Aspilaire for the administrative assistant position for the first shift only. McQuade Decl. Ex. 3, at 33-34; Uram Decl., ¶ 6.

55.    Uram selected Susan Price for the administrative assistant position on the first shift. McQuade Decl. Ex. 3, at 27; Uram Decl., ¶ 7.

56.    Prior to being hired for this position, Price had worked as a document specialist and in batch records in the Quality Assurance, Documentation Management Group at Wyeth. McQuade Decl. Ex. 3, at 28; Uram Decl., ¶ 7 & Ex. 1.

57.    Price's function in the Quality Assurance area was to support Department 421's operations. Uram Decl., ¶ 7.

58.    Price's duties as a document specialist included maintaining the document tracking system and issuing and distributing official copies of Wyeth's standard operating procedures. *Id.* & Ex. 1.

59.    In batch records, Price was responsible for filling, assembling and producing bulk batch records, including reconciling the batch records issued with information in the batch record logbook and maintaining the batch record files. *Id.*

60.    Price also had ten years of experience working as an office manager and seven years of experience as an administrative assistant before joining Wyeth. *Id.* Her duties as an office manager included generating daily and monthly productivity and sales activity reports, preparing biweekly payroll data, and managing a total of six desk clerks. *Id.* As an administrative assistant for past employers, Price's duties included maintaining a database of information, inputting data into the system, and generating and distributing database reports. *Id.*

61.    Uram felt that Price was the most qualified for the position because of her previous work experience and her experience in the quality assurance area at Wyeth where she

issued batch records and their supporting documents. Uram Decl., ¶ 8. Uram viewed Price's

extensive experience working with batch records in the quality assurance area as a stronger

qualification than Aspilaire's experience working on the production floor. *Id.*

62.     In addition to reviewing their resumes and experience, Uram spoke to Georgia

Sloboda, a co-head of Aspilaire's department, about various candidates for the administrative

assistant position. Uram Decl., ¶ 9. Sloboda gave Uram positive feedback regarding Price. *Id.*

She told Uram that Price was dependable and reliable. *Id.*; McQuade Decl. Ex. 3, at 47.

Regarding Aspilaire, Sloboda mentioned that she had attendance and tardiness issues in the past.

*Id.*; McQuade Decl. Ex. 3, at 44-45.

63.     Uram was particularly concerned about Aspilaire's history of attendance and

tardiness issues because it was important that each of the three administrative assistants arrive at

work on time so that they could pass off documents and verbally convey information to the

administrative assistant working on the next shift. Uram Decl., ¶ 10.

64.     In fact, Aspilaire had a history of problems with attendance and tardiness,

including the following documented events:

        a.     On November 6, 2001, Aspilaire received a memo from her supervisor

Jason Rogan, advising her that she had been late to work on three occasions since October 5,

2001 and that she needed to improve this. McQuade Decl. Ex. 1, at 241-42 & Ex. 20.

        b.     On August 6, 2002, Aspilaire received a memo from her supervisor

Michael Bennis, advising her that she had been late to work on at least nine occasions since

January 1, 2002 and that she needed to improve this. McQuade Decl. Ex. 1, at 243-44 & Ex. 21.

        c.     On May 27, 2003, Aspilaire received a memo from her supervisor Michael

Bennis, advising her that she had been late to work on six occasions since January 2003 and that

she was in violation of Wyeth's policy regarding lateness. McQuade Decl. Ex. 1, at 244-45 & Ex. 22.

       d.     On November 6, 2003, Aspilaire received a memo from her supervisor Carolyn Simmons, notifying her that she had been absent from work on five days since January 2003 and that she needed to improve her attendance. McQuade Decl. Ex. 1, at 245 & Ex. 23.

       e.     On March 30, 2004, Aspilaire received a memo from her supervisor Michael Clark, advising her that she had been late on eight occasions since January 2004 and that she needed to improve in this area. McQuade Decl. Ex. 1, at 248 & Ex. 24.

    65.    Aspilaire admits that she does not believe that these warnings for lateness or tardiness were discriminatory or retaliatory in any way. McQuade Decl. Ex. 1, at 248-49. Aspilaire also admits that she did not receive any type of adverse employment action in connection with her receipt of any of these memos for absences and lateness. McQuade Decl. Ex. 1, at 247.

    66.    Uram selected Gladys Staniszewski for the administrative assistant position on the second shift. McQuade Decl. Ex. 2, at 27; Uram Decl., ¶ 12. Uram felt that Staniszewski was most qualified for this position on the second shift given her background. Uram Decl., ¶ 12. Before joining Wyeth, Staniszewski had two years of experience as an administrative assistant. *Id.* & Ex. 2. As an administrative assistant with prior employers, Staniszewski's duties included record retention and retrieval, data entry, and tracking and updating the status of client orders. *Id.*

    67.    Uram selected Louvenia Alford, an African-American woman, for the administrative assistant position on the third shift. McQuade Decl. Ex. 2., at 27; Uram Decl., ¶ 13.

68.     Aspilaire admits that Alford and Staniszewski were qualified for the position. McQuade Decl. Ex. 1, at 210.

## Aspilaire's Selection to Work on The Flex Team

69.     In or about the summer of 2004, Wyeth established a team of employees, including operators, supervisors, managers, and Human Resources professionals to examine operations at the Pearl River facility for the purpose of increasing production efficiencies. McQuade Decl. Ex. 1, at 24, 67; Declaration of Christine Wilkinson ("Wilkinson Decl."), ¶ 2.

70.     Part of the Flex Team's objective was to improve employee morale and to promote communication between union employees and their supervisors, so as to increase production efficiency.  McQuade Decl. Ex. 1, at 68, 177; Wilkinson Decl., ¶ 3.

71.     Georgia Sloboda selected Aspilaire to join the Flex Team.  McQuade Decl. Ex. 1, at 67-68, 174-76.

72.     Aspilaire admits that her selection for the Flex Team was a positive action and that her selection for this team could have helped her obtain experience that could have lead to a promotion. McQuade Decl. Ex. 1, at 176-78.

73.     One of Aspilaire's roles on the Flex Team was to talk to union employees, to learn what their complaints and concerns were, and to bring those complaints and concerns to the attention of management so that they could be addressed.  McQuade Decl. Ex. 1, at 68; Wilkinson Decl., ¶ 4.

74.     As part of her work on the Flex Team, Aspilaire spoke to operators in Department 421, prepared a list of their complaints, and presented those complaints at a Flex Team meeting. McQuade Decl. Ex. 1, at 182-84 & Ex. 15; Wilkinson Decl., ¶ 5.  These complaints included complaints about scheduling, rotating work assignments, and being forced to work the first shift

and the second shift for a total of 16 hours in one day. McQuade Decl. Ex. 1, at 182-85, 88 & Ex. 15; McQuade Decl. Ex. 2, at 28-30; Wilkinson Decl., ¶ 5.

75.    At the time Aspilaire made this list, there were approximately 100 employees in Department 421, and these same complaints were registered by employees of all races. McQuade Decl. Ex. 1, at 186-88; Ex. 2, at 30-31; Wilkinson Decl., ¶ 6.

76.    In addition, Christine Wilkinson, a Human Resources representative on the Flex Team, held meetings with approximately 150 employees of Department 421 in or about November 2004 to get their feedback. Wilkinson Decl., ¶ 6. During these meetings, Wilkinson heard multiple complaints from employees, including complaints of too much overtime and complaints that overtime should not exceed four hours instead of the maximum eight hour overtime in effect at the time. *Id.* These complaints were registered by employees of all races and national origins. *Id.*

77.    Aspilaire admits that morale was low among all employees in Department 421, that employees had "different gripes" in or around 2004, including complaints about forced overtime, about being assigned to the inspection area and not other areas, and about working double shifts. McQuade Decl. Ex. 1, at 277-78.

78.    Aspilaire admits that, during that time period "everyone complained" about the same scheduling issues that she had. McQuade Decl. Ex. 1, at 7-74.

79.    In or about the summer or fall of 2004, Aspilaire, along with some of her colleagues, visited Wilkinson and complained that they were being scheduled frequently to work in the inspection area. McQuade Decl. Ex. 1, 63-65, 68-69, 71, 166-67; Wilkinson Decl., ¶ 7.

80.     Aspilaire did not tell Wilkinson or suggest in any way that she felt that she had been treated unfairly because of her race.   McQuade Decl. Ex. 1, at 57-60, 63-67, 225-26; Wilkinson Decl., ¶ 7.

81.     Aspilaire understood that if she wanted to make a complaint of discrimination she had a number of avenues for making such a complaint, including complaining to Wyeth's Human Resources Department or to a union shop steward.  McQuade Decl. Ex. 1, at 60-63.

82.     Aspilaire does not recall ever having made a complaint of discrimination while employed by Wyeth.  McQuade Decl. Ex. 1, at 61.

## Aspilaire's Resignation from Wyeth

83.     In or about October 2004, Aspilaire applied for a position as a packaging supervisor at Par Pharmaceuticals. McQuade Decl. Ex. 1, at 249-51.

84.     By letter dated March 14, 2005, Aspilaire advised Coen and Sloboda that she had accepted a job with another company and intended to leave Wyeth in two weeks.  The letter stated in part:

> I have decided that it is time to move on and I have accepted a position elsewhere. This was not an easy decision and took a lot of consideration.  However, I am confident that my new role will help me move towards some of the goals I have for my career.  Please be assured that I will do all I can to assist in the smooth transfer of my responsibilities before leaving.  I wish both you and Wyeth every good fortune and I would like to thank you for having me as part of your team.

McQuade Decl. Ex. 1, at 260 & Ex. 26.

85.     Aspilaire continued to work at Wyeth for an additional two weeks after submitting her letter of resignation. McQuade Decl. Ex. 1, at 260.

86.     Aspilaire testified that she resigned from Wyeth because she had received a better job opportunity from Par Pharmaceuticals:

Q:     Why did you move from Wyeth to Par?

A:      Advancement opportunities.

Q:      What do you mean by that?

A:      Supervisor position, going from an operator to be a supervisor to get into management positions.

Q:      So you left Wyeth because you had a better opportunity present itself at Par.

A:      At other companies, yes.

. . . .

Q:      If you didn't get the job at Par Pharmaceuticals what would you have done?  You wouldn't have quit Wyeth without having that job, would you?

A:      No.

McQuade Decl. Ex. 1, at 256-57, 269.

87.     Aspilaire testified that she felt that her work place had become intolerable because she was not being asked to perform the job responsibilities of a lead pharmaceutical operator, but instead was being asked to perform the job duties of an operator.  McQuade Decl. Ex. 1, at 256-57.

**Wyeth Harassment Policies And Practices**

88.     Wyeth has had a written policy against unlawful discrimination during all times relevant to this case.  Rowan Decl., ¶ 13.

89.     The purpose of Wyeth's discrimination policy is to ensure that all employees are permitted to work in an environment free from any type of unlawful discrimination or harassment.  Rowan Decl., ¶ 14.

90.     Under the policy effective from July 1, 2001 through June 30, 2002, Wyeth employees were "strongly encourage[d]" to promptly report to their immediate manager, any other manager, or their Human Resources representative, "all incidents of discrimination,

discriminatory harassment or other inappropriate workplace behavior." Rowan Decl., ¶ 15. The policy directed employees who felt that using the complaint procedure would be "unreasonable" or who felt unsatisfied with a manager's response to their complaint, to discuss their concerns with any Regional Human Resources representative, or to contact Wyeth's Human Resources Help Line. *Id.*

91.     Under Wyeth's policy, if a complaint of discrimination were reported to the Human Resources Department, Human Resources would promptly investigate and advise management on appropriate action. Rowan Decl., ¶ 16. If, after an investigation is conducted, Wyeth concludes that unlawful harassment or discrimination has occurred in violation of its policies, Wyeth will take appropriate action to correct the situation. *Id.*

92.     The policy in place from 2002 to the present is substantially similar to the earlier version of the policy described above. Rowan Decl., ¶ 17.

93.     Wyeth's policy against unlawful discrimination is also included in Wyeth's Code of Conduct.  Rowan Decl., ¶ 18.

94.     In addition, Wyeth posts its policies against unlawful harassment in memoranda on bulletin boards at the entrances and exits of the Pearl River plant, and at designated buildings throughout the site.  Rowan Decl., ¶ 19.

95.     Article 2.5 of the Union Contract provides that Wyeth and the Union "agree there shall be no discrimination of employees because of race, color, creed, age, religion, national origin, sex, marital status, handicap, Vietnam veteran, or disabled veteran." Rowan Decl., ¶ 20.

96.     Article 7.1 of the Union Contract outlines a formal written grievance procedure for employees.  McQuade Decl. Ex. 1, at 44-45, & Ex. 5; Rowan Decl., ¶ 20.

97.     Article 7.2 of the Union Contract states that an employee has the right to have a grievance adjusted without the intervention of a union representative.  McQuade Decl. Ex. 1, at 44-45, & Ex. 5; Rowan Decl., ¶ 20.

98.     Aspilaire understood that, while employed at Wyeth, she had the right to file complaints and grievances pertaining to her membership in the Union.  McQuade Decl. Ex. 1, at 47.

99.     Aspilaire never filed any formal grievance with the Union during her employment at Wyeth.  Rowan Decl., ¶ 21.

100.    Aspilaire filed her Complaint in this action on January 12, 2007.  McQuade Decl. Ex. 1, & Ex. 1.

Dated: New York, New York
       July 3, 2008

                          ORRICK, HERRINGTON & SUTCLIFFE LLP

                          By: _____
                              Michael Delikat
                              James H. McQuade
                              Mayotta H. Anderson
                              666 Fifth Avenue
                              New York, New York 10103
                              (212) 506-5000

                          Attorneys for Defendant Wyeth Pharmaceuticals, Inc.